UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
MICHELLE O'NEILL, individually and as       )
administrator of the estate of Michael Romano )
Jr.; DARLENE ROMANO, as administrator of    )
the estate of Michael Romano Jr.; MICHAEL   )
O'NEILL; and MICHAYLA O'NEILL,              )
                                            )
        Plaintiffs,                         )   Civil Action No.
                                            )   17-12057-FDS
        v.                                  )
                                            )
UNITED STATES of AMERICA,                   )
                                            )
        Defendant.                          )
_____ )

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

SAYLOR, J.

This is another civil action arising out of the relationship between the Federal Bureau of Investigation and organized crime leaders in Boston in the 1980s and 1990s. Plaintiffs are the widow, two children, and estate administrator of Michael Romano Jr., a member of the Carrozza faction of La Casa Nostra. Romano Jr. was murdered by individuals affiliated with Francis "Cadillac Frank" Salemme in 1994. Romano Jr. was mistaken for a rival Mafia leader, Enrico Ponzo, and shot at close range while changing a flat tire. Plaintiffs allege that Mark Rossetti, a mob leader aligned with Salemme who was also an FBI informant, had ordered the hit on Ponzo.[1]

Plaintiffs have brought suit against the United States under the under the Federal Tort

---

[1] Because both Mark Rossetti and Stephen Rossetti were allegedly involved in the Romano Jr. murder, the Court will use their full names in this opinion.

Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, for failure to prevent the murder. The United States has moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim. It contends that because a private person would not have owed a duty to Romano Jr. to control the actions of Mark Rossetti, the United States has not waived its sovereign immunity under the FTCA. It further contends that the claims are barred by the statute of limitations.

For the following reasons, the motion to dismiss for lack of subject-matter jurisdiction will be granted. Because the Court concludes that sovereign immunity has not been waived, it will not reach the limitations issue, and the motion to dismiss for failure to state a claim will be denied as moot.

## I. Background

### A. Factual Background

The facts are set forth as described in the complaint and public record.

#### 1. Infighting in the New England Mafia

La Cosa Nostra, also known as the Mafia, is a "notorious crime syndicate." *United States v. DeCologero*, 364 F.3d 12, 17 (1st Cir. 2004). During much of the second half of the 20th century, the New England branch of the Mafia, the Patriarca crime family, was led by Raymond Patriarca Sr. *Id.* After Patriarca Sr.'s death in 1984, his son Raymond Patriarca Jr. took over operations. *Id.* By 1990, Patriarca Jr.'s heir-apparent was Francis Salemme, better known as "Cadillac Frank" Salemme. *Id.* However, a faction of the Patriarca family, led by Robert Carrozza, Joseph Russo, and Vincent Ferrarra (the "Carrozza faction"), began challenging Patriarca Jr.'s leadership. *United States v. Marino*, 277 F.3d 11, 19 (1st Cir. 2002).

In 1991, Salemme became the leader of the Patriarca family. *Id.* The Carrozza faction

challenged Salemme and his faction, and various individuals on both sides of the conflict were murdered. *Id.* Sometime in early-to-mid-1994, members of the Carrozza faction, including Michael Romano Sr. (Michael Romano Jr.'s father), Enrico Ponzo, and others, plotted to kill certain members of the Salemme faction, including Mark Rossetti. *Id.* at 20. Romano Sr.'s son, Michael Romano Jr., was also a "Carrozza stalwart[]." *Id.* Around that time, the two sides met in a "peace" meeting but negotiations fell through. *Id.*

### 2. **Involvement of the Irish Mob**

Stephen "The Rifleman" Flemmi was also a long-time "fixture in Boston's organized crime hierarchy." *United States v. Flemmi*, 225 F.3d 78, 81 (1st Cir. 2000). Flemmi and Whitey Bulger were leaders of the Irish Mob in Boston, the Winter Hill Gang. *Id.* Flemmi did extensive business with La Casa Nostra, and was a close associate of Salemme. *Id.*; *United States v. Salemme*, 91 F. Supp. 2d 141, 176 (D. Mass. 1999). However, beginning in the 1960s, Flemmi and Bulger began cooperating with the FBI. *Flemmi*, 225 F.3d at 81. By 1967, both men were "top-echelon informants," helping government officials investigate and eventually prosecute major Mafia figures. *Id.*

### 3. **The Murder of Michael Romano Jr.**

On September 1, 1994, Michael Romano Jr., then 20 years old, was murdered by Salemme faction members David Clark, Joseph Souza, and Stephen Rossetti. (Def. Ex. B, Luisi Tr. at 151-53).[2] Romano Jr. was shot at close range while changing a flat tire in Everett. He had been mistakenly identified as Ponzo, the intended target of the shooting. (Am. Compl. ¶ 10).

The complaint alleges that Mark Rossetti, a FBI informant, sought to kill Ponzo to help the Salemme faction take control of Mafia operations in the Boston area. (*Id.* ¶¶ 12-13). After

---

[2] Mark and Stephen Rossetti are cousins.

3

the murder of his son, Romano Sr. called Salemme faction member Robert Luisi Jr. and stated "I thought we were going to leave the kids out of this." (Def. Ex. B, Luisi Tr. at 147-54).

Soon after Romano Jr.'s murder, the Carrozza faction met at the Northgate Mall to determine the responsible party. *Marino*, 277 F.3d at 20. Speculation initially focused on Ponzo himself and Salemme faction members Joseph Cirame, Clark, Souza, Lonnie Hilson, and Salemme. *Id.* To retaliate for the murder, the Carrozza faction developed a "hit list." *Id.* Carrozza faction members twice attempted to kill Cirame; opened fire on Stephen Rossetti; and attempted to murder Salemme. *Id.* Romano Sr. personally shot and killed Souza. *Id.*

### 4. **FBI Corruption is Revealed**

In 1995, Flemmi and various Mafia members, along with Salemme, were arrested on RICO charges. *Rakes v. United States*, 442 F.3d 7, 14 (1st Cir. 2006). Flemmi's Winter Hill colleague, Bulger, escaped before being arrested. *Id.* The media began investigating allegations of FBI wrongdoing, particularly by Special Agent John Connolly. *Id.* Judge Wolf of this district held a 10-month hearing into the FBI's connections with the Irish Mob, culminating in an opinion detailing corruption in the FBI. *See generally Salemme*, 91 F. Supp. 2d 141. The opinion suggested that Bulger and Flemmi may have "received numerous benefits from the FBI . . . including protection from prosecution [and] access to the names of informants who were themselves providing information to the FBI . . . ." *McIntyre v. United States*, 367 F.3d 38, 40 (1st Cir. 2004).

### 5. **Michael Romano Sr.'s Accusation**

On February 29, 2000, Michael Romano Sr. was sentenced to a term of 252 months' imprisonment for conspiracy to commit murder in aid of racketeering and other related charges. *See United States v. Carrozza et al.*, 97-cr-40009-NMG, Docket No. 1112. At sentencing,

4

Romano Sr. made the following statements:

> [Judge Wolf] found out that the Justice Department and the FBI allowed Stephen Flemmi and Whitey Bulger to operate their illegal organized crime gang with their partner, as indicted by the government, Frank Salemme.
>
> . . .
>
> Yes, Stevie Flemmi, Whitey Bulger, and his partner, as charged, Frank Salemme, sent their hit squad out to revenge who shot Salemme. And who allowed all this to happen? The FBI and the Justice Department.
>
> . . .
>
> I ask you, where was the FBI agents and the prosecutors and the Justice Department employees and the Boston and state police when all these people were being murdered? Let me tell you. The corrupt ex, ex—and I reiterate 'ex'—FBI agents and others still to be named were keeping them all in the dark by protecting the likes of Frank Salemme and his partners, Flemmi and Bulger, allowing them to operate, resulting in the murder of many, many more people, one being my only dear son.
>
> . . .
>
> Where was the investigations all those years when all those families like mine were being destroyed and murdered? I'll tell you, as ex-FBI Agent John Connolly will soon enough. The FBI and the Justice Department employees were protecting them. Remember when Stevie Flemmi and Whitey Bulger and Frank Salemme sent out their gang of killers to shoot whom they thought had shot Frank Salemme September 1st? They . . . killed my son by accident. They were all working and was being protected by the FBI and the U.S. Attorney's Office. My son's blood and that of Trooper Charbon[n]ier and that of many others are all on their hands. They, too, are responsible for their deaths and all those murders that could have been prevented if they just did their own jobs.

(Def. Ex. A, Romano Sr. Sen. Tr. at 48, 50, 52, 57-58).

While Michael Romano Sr. was imprisoned, news outlets reported that Salemme faction member Mark Rossetti had been an FBI informant. *See, e.g.*, Milton J. Valencia, *Reputed Mob Boss Is Called FBI Informant*, Boston Globe, Aug. 12, 2011, *available at* 2011 WLNR 15966564; Peter Gelzinis, *Just Another Rotten Apple in FBI Barrel*, Boston Herald, Aug. 25, 2011, *available at* 2011 WLNR 16868898. The complaint states that Mark Rossetti had become

5

an FBI informant sometime before Romano Jr.'s death. (Am. Compl. ¶ 8). It further alleges that FBI agents were aware that Mark Rossetti was responsible for multiple murders in the Greater Boston area and that he was planning to kill Ponzo. (*Id.* ¶¶ 12-13).

In December 2011, the Boston Globe reported that Romano Sr. blamed the FBI for his son's death:

> Mike Romano [Sr.] is no choirboy. And he admits he was trying to find out who killed his son, Mikey. He says that just when he was getting close to figuring out who did it, the FBI and Justice Department swooped in to take him and a faction opposed to then-Mafia boss Frank Salemme off the street. Romano says, and many in law enforcement agree, that Mark Rossetti was aligned with the Salemme group, which Romano believes was responsible for his son's death. The FBI let Rossetti and his associates shoot and kill with impunity, Romano contends. "All we did was try to protect ourselves," Romano said.

Kevin Cullen, *From Mouths of Criminals*, Boston Globe, Dec. 6, 2011, *available at* 2011 WLNR 25187726.

A 2012 Channel 5 WCVB news report on Romano Sr.'s allegations also highlighted the murder of State Trooper Mark Charbonnier, who was killed hours after Romano Jr. Charbonnier had been killed by David Clark, "[Mark] Rossetti's soldier, his right-hand man." *See Team 5 Investigates: Mark Rossetti Kills Kid*, *available at* https://www.youtube.com/watch?v=-46RW87ecpI&feature=youtu.be. The news report stated that Charbonnier was killed because he pulled over Clark, who was believed to be fleeing from the scene of Romano Jr.'s murder. *Id.*

### 6. Admission of the Salemme Faction's Involvement

Around the same time the media reported on Mark Rossetti's involvement with the FBI, Enrico Ponzo was arrested in Idaho. *See United States v. Ponzo*, 2014 WL 1364796, at *1 (D. Mass. Apr. 3, 2014). In a report about Ponzo's arrest, ABC News stated that "[Mark] Rossetti is suspected of killing the younger Romano while working as an FBI informant." Michele McPhee, *Wanted Mobster Found Masquerading as a Cattle Rancher in Idaho*, ABC News, Oct.

6

7, 2013, *available at* https://abcnews.go.com/US/wanted-mobster-found-masquerading-cattle-rancher-idaho/story?id=20499127.

Ponzo was tried and convicted in fall 2013 of numerous crimes relating to his involvement in the Mafia during the 1980s and 1990s. *United States v. Ponzo*, 853 F.3d 558, 567 (1st Cir. 2017). On October 31, 2013, during Ponzo's trial, Luisi testified that he and the Rossettis had planned to kill Ponzo. (Def. Ex. B, Luisi Tr. at 147-48). Luisi recounted that after Romano Jr.'s death, Stephen Rossetti told him that he, Clark, and Souza had accidentally killed Romano Jr in an attempt to murder Ponzo. (*Id.* at 152-53).

### B. Procedural Background

On November 1, 2016, plaintiffs presented four administrative claims to the FBI, one from each individual plaintiff. (Def. Ex. D). Plaintiffs sought $50 million, alleging that the FBI's negligence in its dealings with Mark Rossetti led to Romano Jr.'s death. (*Id.*). After the FBI denied the claims, plaintiffs brought this suit on October 20, 2017. An amended complaint was filed on January 18, 2018.

The amended complaint asserts two counts, both brought under the FTCA. Count 1 is a wrongful death claim brought by Michelle O'Neill and Darlene Romano, as administrators of the estate of Romano Jr., alleging that the FBI and its agents negligently permitted Romano Jr.'s murder. Count 2 is a claim for loss of consortium brought by Michelle O'Neill, Michael O'Neill, and Michayla O'Neill in their individual capacities. The United States has moved to dismiss the complaint on the basis of sovereign immunity and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## II. Legal Standard

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and

give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

III. **Analysis**

   A. **Sovereign Immunity Generally**

"Under settled principles of sovereign immunity, 'the United States, as sovereign, is immune from suit, save as it consents to be sued and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Dalm*, 494 U.S. 596, 608 (1990) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)) (internal quotation marks and alterations omitted); *see also* Charles A. Wright & Arthur R. Miller, 14 Fed. Prac. & Proc. § 3654 (4th ed.) ("[T]he absence of consent by the United States to suit has been treated by courts as a fundamental defect that deprives the district court of subject matter jurisdiction."). The FBI, an as an agency of the United States, is also entitled to sovereign immunity. *Sarit v. U.S. Drug*

*Enforcement Admin.*, 987 F.2d 10, 16 (1st Cir. 1993). A plaintiff bears the "burden of proving [that] sovereign immunity has been waived." *Mahon v. United States*, 742 F.3d 11, 14 (1st Cir. 2014).

The FTCA acts as a partial waiver of sovereign immunity, rendering the United States liable for certain tort and contract claims. *See* 28 U.S.C. § 2671 *et seq*. The grant of jurisdiction to the district courts to hear FTCA claims against the United States is coextensive with the act's waiver of sovereign immunity. Thus, actions that do not fall under the express terms of the FTCA's waiver must be dismissed for lack of subject-matter jurisdiction. *Id.*; *Wood v. United States*, 290 F.3d 29, 35 (1st Cir. 2002).

The FTCA grants jurisdiction to the district courts to hear claims arising from acts of the United States or its employees acting within the scope of their employment to the extent that "the United States, *if a private person*, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added). A claimant against the government must therefore identify some basis on which a private party would be liable for acts analogous to those the government is alleged to have taken. *McCloskey v. Mueller*, 446 F.3d 262, 267 (1st Cir. 2006). As a result, FTCA liability cannot result from "obligations that are peculiar to governments or official-capacity state actors and which have no private counterpart in state law." *Id.*

Here, plaintiffs seek to recover under the Massachusetts Wrongful Death Statute, Mass. Gen. Laws ch. 229, §§ 1-2 and 6, alleging that the FBI's negligent handling of Mark Rossetti caused Romano Jr.'s death.[3] Plaintiffs appear to proceed on theories of direct and vicarious

---

[3] While Stephen Rossetti was one of Romano Jr.'s murderers, Mark Rossetti was never prosecuted for that crime. The complaint alleges that Mark Rossetti ordered the hit on Ponzo. (Am. Compl. ¶ 13).

9

liability. *See McIntyre v. United States*, 367 F.3d 38, 57-58 (1st Cir. 2004). They suggest that the United States is vicariously liable for the actions of unknown FBI agents who shielded Mark Rossetti from prosecution, giving him the opportunity to commit crimes and proximately causing Romano Jr.'s murder. They also assert that the United States is directly liable for failing to prevent Romano Jr.'s murder, in light of the foreseeable risk that Mark Rossetti would continue to engage in violent criminal activity. Either way, the claim is couched in negligence and may not proceed without a showing that the government owed a legal duty to Romano Jr. *See Gorfinkle v. U.S. Airways, Inc.*, 431 F.3d 19, 23 (1st Cir. 2005) (citing *Davis v. Westwood Group*, 420 Mass. 739, 742 (1995)).

### B. There Is No General Duty of Care to Control Acts of Third Parties

The government contends that it has not waived its sovereign immunity under the FTCA for plaintiffs' claims. It contends that because a private individual does not owe a duty to control the conduct of third parties, it cannot be held liable for the criminal acts of its informants.

As a general principle, that proposition is correct. Under Massachusetts tort law, "there is no duty to control another person's conduct to prevent that person from causing harm to a third party." *Leavitt v. Brockton Hosp., Inc.*, 454 Mass. 37, 40-41 (2009) (citing Restatement (Second) of Torts § 315 (1965)). *But see Davis v. United States*, 670 F.3d 48, 55 (1st Cir. 2012) (cautioning "affirmatively empowering known killers to remain at large is unlikely to be what the SJC had in mind" in *Leavitt*). Such a duty only arises in "narrowly prescribed circumstances," such as where a special relationship exists between the person posing the risk and the one who can prevent the harm. *Leavitt*, 454 Mass. at 41-42 (citing Restatement (Second) of Torts § 315(a)).

Plaintiffs contend that the United States owed a general duty of care to Romano Jr. In

support, they cite another case from this district, *McIntyre v. United States*, 447 F. Supp. 2d 54, 107 (D. Mass. 2006), in which Judge Lindsay held that the government owed such a duty to an informant murdered by Bulger and Flemmi.[4] However, in *McIntyre*, a corrupt FBI agent, John Connolly, had effectively disclosed the informant's identity to Bulger and Flemmi, who then brutally murdered the informant. *See McIntyre ex rel. Estate of McIntyre v. United States*, 545 F.3d 27, 36 (1st Cir. 2008). By contrast, here there is no government/informant relationship involving Romano Jr. Nor is the FBI alleged to have performed any particular affirmative act to materially increase the likelihood that Romano Jr. specifically would be murdered. *See Carrier v. Riddell*, 721 F.2d 867, 868 (1st Cir. 1983) ("[W]here negligence consists of an *omission*—a *failure* to act—a defendant's duty not to act negligently is more limited.") (Breyer, J.) (emphases in original).

Plaintiffs also rely on *Davis v. United States*, 670 F.3d 48 (1st Cir. 2012), in which the First Circuit affirmed a judgment in favor of the estates of two women killed by Bulger and Flemmi. There, the court noted that "FBI agents *affirmatively intervened* to protect Bulger and Flemmi both by tips to the men and by blocking law enforcement measures that would likely have brought them to justice before the murders of the two women." *Id.* at 56 (emphasis added). Here, however, the alleged negligence is largely based on claimed omissions. (*See* Am. Compl. ¶¶ 17-18, 20-21) ("Agents . . . *failed* to properly control . . . Rossetti."; "FBI supervisors . . . negligently . . . *failed* to properly supervise the FBI agents."; "FBI supervisors also *failed* to prevent the improper employment of Rossetti as an informant.") (emphases added).

The only affirmative acts alleged in the complaint are that FBI agents "allow[ed] and/or

---

[4] Special Agent Connolly had disclosed to Bulger and Flemmi that one of two persons taken off a vessel smuggling weapons for the Irish Republican Army was an informant. *McIntyre*, 447 F. Supp. 2d at 98-99.

11

encourage[d] [Mark] Rossetti to commit illegal acts, including ordering acts [of] murder." (*Id.* ¶ 21). But that allegation is threadbare, conclusory and speculative; it is devoid of any specific factual allegations that would make it sufficiently plausible to survive review under *Twombly* and *Iqbal*.

Because the complaint fails to include any well-pleaded facts plausibly showing that the FBI either affirmatively assisted Mark Rossetti in committing crimes, encouraged him to do so, or shielded him from prosecution, the government did not owe a common-law general duty of care to Romano Jr.

### C. There Was No Special Relationship between the FBI and Mark Rossetti

Alternatively, plaintiffs contend that there was a special relationship between the FBI and Mark Rossetti because the FBI had "custody" over him. (Am. Compl. ¶ 25). Massachusetts recognizes four types of special relationships, including parent-child, master-servant, and possessor-licensee relationships. *McCloskey v. Mueller*, 446 F.3d 262, 268 (1st Cir. 2006). "In the same vein, one may acquire a duty to control a third person if he takes charge of that third person and knows or should know that the third person is likely to cause bodily harm to others if not controlled." *Id.* (citation and internal quotation marks omitted).

The first three types of special relationships are inapplicable here. The complaint must therefore plead sufficient facts to show that the FBI effectively "took charge" of, or had custody over, Mark Rossetti. *Id.* n.7. The Eleventh Circuit, applying Georgia law, recently concluded that the mere fact that an individual is an informant does not create such a special relationship, even if the informant violates FBI and Department of Justice confidential-informant policies. *Smith v. United States*, 873 F.3d 1348, 1351-53 (11th Cir. 2017); *cf. Bergmann v. United States*, 689 F.2d 789, 796 (8th Cir. 1982) (concluding that the government did not "take charge" of a

federally protected witness and had no duty to control the witness's conduct). Similarly, in holding that police officers did not have a special relationship with an informant, the Second Circuit stated that "[o]ur own opinions have also focused on involuntary custody as the linchpin of any special relationship exception." *Matican v. City of New York*, 524 F.3d 151, 156 (2d Cir. 2008) (citing *Lombardi v. Whitman*, 485 F.3d 73, 79 n.3 (2d Cir. 2007)).[5]

Here, the complaint is devoid of any factual allegations plausibly suggesting that Mark Rossetti was in the FBI's charge or custody. It makes only conclusory statements, such as "[t]he FBI's relationship with Informant Rossetti had been in effect custodial because the FBI controlled Informant Rossetti's conduct" and "[t]he FBI controlled Informant Rossetti's behavior and could have stopped him from committing numerous criminal actions which included murder." (Am. Compl. ¶¶ 25-26). Without more, the compliant falls well short of the pleading standard set forth in *Twombly* and *Iqbal*.

In short, plaintiffs have failed to show that the United States owed a relevant legal duty under Massachusetts law. Accordingly, the FTCA's waiver of sovereign immunity does not apply, and Count 1 must be dismissed. In addition, without an underlying tortious act, Count 2 (loss of consortium) must also be dismissed. *See Harrington v. City of Attleboro*, 172 F. Supp. 3d 337, 354 (D. Mass. 2016).[6]

---

[5] *Matican* focused on whether the state of New York owed a duty of care to the informant himself, rather than a victim of the informant.

[6] Plaintiffs' claim for loss of consortium in their individual capacities must be dismissed on independent grounds because in Massachusetts, the wrongful death statute constitutes the "exclusive remedy for the recovery of damages for loss or consortium . . . resulting from death" and such claims "must be brought by the decedent's executor or administrator." *Stockdale v. Bird & Son, Inc.*, 399 Mass. 249, 253 (1987); *see also Hallett v. Town of Wrentham*, 398 Mass. 550, 556 (1986). "The executor or administrator 'merely acts as [a] representative or conduit for the children's recovery.'" *Bennett v. United States*, 389 F. Supp. 2d 121, 123 (D. Mass. 2005) (quoting *Gaudette v. Webb*, 362 Mass. 60, 72 (1972)). "There is no independent cause of action that may be brought by individual persons suing in their own right." *Evans v. Cerberus Capital Mgmt., L.P.*, 2014 WL 4794403, at *1 (D. Mass. Sep. 24, 2014).

## IV. Conclusion

The Court is fully cognizant of the history of the FBI's mishandling of confidential organized-crime informants during 1980s and 1990s. However, without plausible factual allegations demonstrating that the FBI had control over Mark Rossetti's actions, or affirmatively acted in some way that furthered his conduct, Romano Jr.'s survivors do not have a claim for money damages against the United States. The government permits itself to be sued only under certain circumstances, and the circumstances here do not qualify.

For the foregoing reasons, defendant's motion to dismiss for lack of subject-matter jurisdiction is GRANTED. Defendant's motion to dismiss for failure to state a claim is DENIED as moot.

**So Ordered.**

Dated: July 13, 2018

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge